**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**TBC CORPORATION d/b/a Carroll Tire Company, LLC, Defendant.**

**No. CV 110–115.**

United States District Court, S.D. Georgia, Augusta Division.

March 30, 2012.

Chandra Cain Davis, James Cerwinski, U.S. Equal Employment Opportunity Commission, Robert K. Dawkins, Atlanta, GA, Kenneth D. Crowder, U.S. Attorney's Office, Augusta, GA, for Plaintiff.

Troy A. Lanier, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, for Defendant.

## ORDER

J. RANDAL HALL, District Judge.

Presently pending before the Court is TBC Corporation d/b/a Carroll Tire Company, LLC's ("Defendant") motion for summary judgment. (Doc. no. 23.) Upon due consideration and for the reasons set forth below, this motion is hereby **GRANTED.**

## I. BACKGROUND

This case arises from Terrilyn Holliday's ("Holliday") termination from Defendant's branch located in Grovetown, Georgia ("Grovetown branch"). Defendant is a wholesale tire distributor that supplies tires to retail dealers. (Pl.'s Statement of Material Fact ¶ 1.) On January 19, 1999, Holliday was hired as a part-time operations clerk at the Grovetown branch. (Holliday Dep. at 52.) On February 21, 2005, after several promotions, Holliday was promoted to Assistant Manager. (Id. at 227.) In late June of 2005, Cliff Watts ("Watts") became the Grovetown Branch Manager.

Holliday worked as Assistant Manager during the period of time that Watts served as Branch Manager. (Pl.'s St. of Material Facts ¶ 4.) Under Watts, the Grovetown branch operated in a casual and relaxed manner. (Alleva Dep. at 37, 103; McCullough Dep. at 124, 166.) Holliday enjoyed a close "family-like" relationship with her co-workers. (Holliday Dep. at 58, 142; Watts Dep. at 46.) Notably, under Watts' management, the Grovetown branch sold to end users despite Defendant's policy against this practice. (Ramirez Dep. at 275–77, 286–87.) Selling to end users causes Defendant to compete with its retail customers and harms customer relationships. (Spivey Dep. at 21; Ramirez Dep. at 275–77, 286–87.) Additionally, although the Grovetown branch maintained extraordinarily high overdue credit accounts, Watts and Holliday continued to make sales to customers who were not credit worthy. (McCullough Dep. at 209–10, 212–13.) The Grovetown branch also suffered from inventory discrepancies and employee tire theft during this time period. (Id. at 113, 142; Holliday Dep. at 28–32, 103; Ramirez Dep. at 57–58.)

Watts was implicated during an investigation of the employee theft issue by Defendant's Human Resources Vice President, Marty Wommack and Defendant's Regional Manager James McCullough. (McCullough Dep. at 96–101.) Watts was questioned and resigned as a result of the allegations. (Id.; Watts Dep. at 33, 37–44.) Although Holliday was not implicated, she never attempted to address the employee theft issue with anyone above Watts' level despite her knowledge of the situation. (Wommack Dep. at 66–67; Holliday Dep. at 101.)

After Watts' departure, Holliday served as interim manager of the Grovetown branch for approximately six weeks. (Holliday Dep. at 101–02, 107.) She made no

changes to the Grovetown branch operations during this time. (*Id.*) In fact, despite an ongoing theft problem, Holliday merely did "spot checks" of the inventory in order to reduce the incidences of employee theft. (*Id.* at 101.)

As the Human Resources Vice President, Wommack was responsible for selecting Watts' replacement. (Wommack Dep. at 20; McCullough Dep. at 227.) Wommack determined that the Grovetown branch needed more structure and discipline than it had under Watts. (Wommack Dep. at 59–60, 80–81.) Although he considered Holliday as a possible replacement candidate, he believed that she was not ready to assume the position of Branch Manager. (*Id.*) Instead, Wommack determined that James Spivey was the most qualified person to serve as Branch Manager. (*Id.* at 59.) Spivey was known for being "very detailed" and "very structured," as well as a stickler for Defendant's company rules. (Holliday Dep. at 154; Alleva Dep. at 44.)

Spivey attempted to change the culture of the Grovetown branch and certain aspects of the branch's operations. (Holliday Dep. at 147; Alleva Dep. at 99.) Holliday, however, resisted many of Spivey's changes. Despite Spivey's instructions to the contrary, Holliday continued to sell to end users.[1] (Spivey Dep. at 21, 27–28.) When Spivey attempted to change the loading time for trucks leaving with products for customers, Holliday resisted. (Holliday Dep. at 107–08; *Id.* at 43–45.) Spivey contends that Holliday refused to assist him in placing delinquent accounts on payment plans, although Holliday states that she would call customers to work out payment plans as part of her duties as Assistant Manager. (Spivey Dep. at 33; Holliday Dep. at 281.) On at least one occasion, Holliday refused to follow Spivey's instruction to refrain from phone sales while she was catching up on receiving inventory. (Spivey Dep. at 39–40.) When Spivey brought Holliday's performance issues to McCullough's attention, McCullough consistently instructed Spivey to continue attempting to work with her. (*Id.* at 64–68; McCullough Dep. at 180–81, 216–17.)

When Spivey was transferred to another branch, Holliday again served as interim Branch Manager. During this time, Holliday made no significant changes to the operations of the Grovetown branch. (Holliday Dep. at 102, 107.) Wommack considered Holliday as a replacement for the Branch Manager position, but ultimately concluded that she was still not ready to assume that position. (Wommack Dep. at 119–20.) Instead, Wommack determined that Richard Ramirez was the most qualified person to address the needs of the branch. (*Id.* at 118–19.) Ramirez is described as "very detailed," "very structured," and "by-the-book" in enforcing Defendant's policies. (Alleva Dep. 45; McCullough Dep. at 249.) Despite Ramirez's qualifications, Holliday believed that she should have received the Branch Manager position. (Alleva Dep. at 93; Holliday Dep. at 117; Wommack Dep. at 200–01.)

When Ramirez arrived at the Grovetown branch, Holliday was insubordinate and refused to follow his directives. Specifically, Holliday took an excessive number of

---

1. Although Plaintiff relies on an affidavit signed by Holliday stating that she only sold to Defendant's approved customers with accounts, this affidavit does not directly refute Defendant's contention that Holliday continued to sell to end users under Spivey. At the time Spivey came to the Grovetown branch, many customer accounts were already set up with end users. (Spivey Dep. at 21, 26–27.) Thus, Plaintiff's assertion that she only sold to customer accounts does not necessarily mean that she did not sell to end users.

smoking breaks despite Ramirez counseling her on over ten separate occasions about limiting these breaks. (Ramirez Dep. at 109–13.) Furthermore, Ramirez maintains that he counseled Holliday on over seven occasions regarding her failure to catch up on receiving and on more than ten occasions regarding her practice of inappropriately extending preferred pricing to customers. (*Id.* at 97, 144, 162, 174, 185, 278.) Ramirez further contends that Holliday continued to sell to customers with bad credit in violation of his directive and that she refused to follow his instructions regarding the routing of trucks. (*Id.* at 202, 207.) Additionally, Ramirez asserts that Holliday continued her practice of selling to end users, despite his instructions to the contrary. (*Id.* at 279–82.) Indeed, in one instance, Ramirez states that Holliday attempted to sell tires to her brother. (*Id.* at 212–14.) When Ramirez stopped the sale, Holliday allegedly called a customer and offered a preferred price in exchange for the customer selling her brother the tires at that low rate. (*Id.*) Finally, Ramirez maintains that Holliday refused to follow his instructions regarding the order in which products should be received. (*Id.* at 107.)

Plaintiff disputes several of these contentions. First, Plaintiff argues that Holliday did not sell to her brother as an end user. (Holliday Aff. ¶ 24.) Instead, Holliday states her brother merely asked to look at tires and that he later bought them from a dealer. (*Id.* ¶¶ 24, 25) Holliday further explains she did not give that dealer *undue* preferred pricing. (*Id.* ¶ 26.) Plaintiff also argues that Holliday did not sell to end users because she only sold to Defendant's existing customers. (*Id.* ¶ 24, 27–29.) Finally, Holliday contends that when Ramirez asked her to catch up on her receiving, she did so. (Holliday Dep. at 238.)

During the three months that Ramirez was Holliday's superior, the two maintained a strained relationship. Holliday complained to her co-workers about Ramirez and was admittedly rude to him. (Alleva Dep. at 67, 70; Holliday Dep. 94, 150.) Holliday claims Ramirez was rude to her and that she called McCullough to discuss Ramirez's rude behavior, although McCullough never returned her call. (Holliday Dep. at 90–91.) Interestingly, Holliday kept a calendar in the Grovetown branch office on which she kept a log of Ramirez's time away from the office. (*Id.* at 153, 179–80.) Holliday maintained this practice in order to use the information against him at a later date. (*Id.*) Due to these personality and performance issues, Ramirez repeatedly sought advice from McCullough. In response, McCullough advised Ramirez to continue attempting to work with Holliday. (Ramirez Dep. at 118–19, 193–94, 261–62; McCullough Dep. at 181, 237, 258, 263, 266.)

Meanwhile, although Holliday asserts she was not *actively* pursuing other employment opportunities, Holliday inquired about possible job openings with a competitor of Defendant and with Defendant's customers. (Holliday Dep. at 141–44; Alleva Dep. at 68–69; McCullough Dep. at 239; Ramirez Dep. at 216–18; Wommack Dep. at 139.) Upon learning that Holliday was seeking employment elsewhere, Wommack and McCullough became convinced that she was unwilling to work with Ramirez and that it was in the best interests of everyone for Defendant to offer a severance package to Holliday. (Wommack Dep. at 128–35, 174–76; McCullough Dep. at 305, 307, 335.) Before deciding to terminate Holliday, Wommack discussed the complaints about Holliday with only McCullough and did not speak directly with Holliday about these issues before her termination. (Wommack Dep. at 131–33, 174–76.)

Holliday refused Defendant's severance package offer, and her employment was terminated. She filed a charge of gender discrimination with the Equal Employment Opportunity Commission ("EEOC") for discriminatory discharge. (Holliday Dep. at 197.) Holliday offered the statement of former Branch Manager Watts as evidence of discrimination. Watts' affidavit states that in late 2006 or early 2007, McCullough told him that "[Holliday] did not need to be an Assistant Manager [and] [t]o get rid of her because she was a woman." (Watts Aff. ¶ 19.) Additionally, Plaintiff alleges that, during a conversation in 2006, McCullough made the statement that "women wasn't [sic] the right place in management in the workplace" when asked why Holliday was not promoted to Branch Manager. (Watts Dep. at 23–27) McCullough categorically denies making either statement. (McCullough Dep. at 274.)

On July 29, 2010, Plaintiff filed suit on behalf of Holliday against Defendant alleging claims of discrimination pursuant to Title VII of the Civil Rights Act of 1964. (Doc. no. 1.) Plaintiff alleges that Defendant violated Title VII by failing to promote and then terminating Holliday because of her sex. (*Id.*) On September 20, 2010, Plaintiff filed an amended complaint. (Doc. no. 7.) Thereafter, on July 18, 2011, Defendant filed a motion for summary judgment.[2] (Doc. no. 23.) Subsequently, Defendant filed a motion to strike (doc. no. 41) portions of certain affidavits attached to Plaintiff's response and an objection to Plaintiff's notice of intent to file surreply

brief (doc. no. 47) based on Plaintiff's failure to comply with Local Rule 7.6.[3]

## II. LEGAL STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor," *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways-by negating an essential element of the non-movant's case or by show-

---

2. In its response, Plaintiff indicated that it is no longer pursuing its claim for failure to promote. (Doc. no. 37 at 11.) Accordingly, Plaintiff's claim for failure to promote in violation of Title VII of the Civil Rights Act of 1964 is hereby **DISMISSED WITH PREJUDICE.**

3. The failure to satisfy the notice and timing provisions of Local Rule 7.6 cannot be used

by an opposing party to have a brief stricken or not considered. *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 610 (S.D.Ga. 2003). Rather, that provision is for the benefit of the Court so that it may delay issuing an order if it chooses to wait for the brief. *Id.* Accordingly, all reply briefs filed with this Court were considered.

ing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if-the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34

(11th Cir.1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave the non-moving party appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 34.) Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. DISCUSSION

Disparate treatment discrimination claims brought under Title VII may be established by one of two ways, through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. *Wright v. Southland Corp.,* 187 F.3d 1287, 1293 (11th Cir.1999); *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998). To evaluate claims based upon *circumstantial evidence,* the Court uses the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Where a plaintiff produces *"direct evidence* of discrimination," however, it is entirely unnecessary to rely on the McDonnell Douglas analysis. *Wright,* 187 F.3d at 1293 (emphasis added); *see also Dybczak v. Tuskegee Inst.,* 737 F.2d 1524, 1528 (11th Cir.1984).

In the case at bar, Plaintiff attempts to prove Holliday's Title VII claim with both direct and circumstantial evidence. The threshold question is thus "not whether plaintiff has made out a prima facie case of discrimination, but whether he even has

to." *Bernstein v. Sephora,* 182 F.Supp.2d 1214, 1217 (S.D.Fla.2002). If the plaintiff presents direct evidence of discrimination that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate, even where the employer presents conflicting evidence. *Id.* (citing *Taylor v. Runyon,* 175 F.3d 861, 867 n. 2 (11th Cir.1999)).

### A. Plaintiff Has Not Identified Direct Evidence Of Discrimination

■ "Direct evidence of employment discrimination is evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the plaintiff on the basis of a protected personal characteristic." *Wright,* 187 F.3d at 1288. "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997). The evidence, if believed, must prove the existence of the fact in issue without inference or presumption. *See Kilpatrick v. Tyson Foods, Inc.,* 268 Fed.Appx. 860, 862 (11th Cir.2008). Thus, "[o]nly the most blatant remarks whose intent could only be to discriminate. constitute direct evidence." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir. 1993).

■ The proffered statements must both "reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision." *Bernstein,* 182 F.Supp.2d at 1217 (citing *Wright,* 187 F.3d at 1294). Furthermore, the biased statement by a decision-maker must be made concurrently with the adverse employment event. *Williamson v. Adventist Health System/Sunbelt,* 372 Fed.Appx.

936, 940 (11th Cir.2010) (citing *Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1359 (11th Cir.1999)). A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination. *Id.*

■ In this case, Plaintiff relies upon two discriminatory statements allegedly made by McCullough regarding Holliday and women in management positions in general.[4] Watts indicates that one of McCullough's alleged discriminatory statements occurred in 2006 and the other in late 2006 or early 2007. (Watts Aff. ¶ 19; Watts Dep. at 23.) It is undisputed that Holliday was not terminated until the end of November 2007. Therefore, any alleged discriminatory statement made by McCullough was made almost a year prior to the adverse employment decision. Thus, Plaintiff cannot demonstrate direct discrimination in this case. Accordingly, the next inquiry is whether Plaintiff has identified sufficient circumstantial evidence of discrimination.

### B. Plaintiff Has Not Identified Sufficient Circumstantial Evidence of Discrimination

In the absence of direct evidence, a plaintiff must establish a prima facie case of discrimination through circumstantial evidence under the burden-shifting paradigm set forth in *McDonnell Douglas.* Under the *McDonnell Douglas* framework, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff "fails to satisfy any one of the elements of a prima facie case," summary judgment against the plaintiff is appropriate. *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1433 (11th Cir.1998).

---

4. Plaintiff relies on a cat's paw theory of liability to impute the alleged discriminatory statements of McCullough to the actual decision maker, Wommack.

If, however, the plaintiff identifies sufficient evidence of a prima facie case, the defendant must then produce a legitimate, non-discriminatory reason to explain the challenged action. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089. This burden is "exceedingly light;" the defendant must merely proffer a non-discriminatory reason, not prove it. *Perryman v. Johnson Prods., Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). Furthermore, the "defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.*

Once a defendant proffers a non-discriminatory reason, the burden shifts back to the plaintiff to prove the proffered reason is mere pretext for the true discriminatory motive. To show that a defendant's stated reasons are pretext, the plaintiff must offer evidence "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). The plaintiff may do this by showing "that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### 1. Plaintiff's Prima Facie Case of Discrimination

■ Pursuant to this burden shifting analysis, the Court will first look to whether Plaintiff has established a prima facie case of discrimination. A plaintiff may

establish a prima facie case of disparate treatment in the workplace by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside of her protected class or was treated less favorably than a similarly-situated individual outside of her protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir.2003).

Here, it is undisputed that Holliday, a female, belongs to a protected class and that she suffered an adverse employment action when Defendant terminated her employment. The Court also finds that Holliday was qualified for her job as Assistant Manager, as evidenced by her employment in that position for almost three years.[5] *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir.2001) ("[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." (alteration in original) (internal quotation marks omitted)). Furthermore, it is undisputed that Holliday was replaced by someone outside her protected class. Thus, Plaintiff has established a prima facie case of gender discrimination under Title VII. Accordingly, the burden shifts to Defendant to articulate legitimate, non-discriminatory reasons for Holliday's termination.

### 2. Defendant's Legitimate, Non–Discriminatory Reasons for Holliday's Termination

■ An employer's burden to rebut an inference of discrimination by presenting

---

**5.** "Of course, the fact that [Holliday] was qualified to perform her job competently does not mean that she actually did so, an issue that is sharply contested by the parties." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir.2010). "The qualifications and experience that get a candidate hired for a job and the performance that is satisfactory enough for her to keep it are two different things." *Id.* Because Holliday's job performance is bound up in the inquiry of whether Defendant's proffered reason for firing her was pretext for discrimination, the Court will consider it at the pretext stage of the analysis. *Id.*

legitimate, non-discriminatory reasons for its employment action is "exceedingly light." *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997) (internal quotation marks omitted). The employer "need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Alvarez,* 610 F.3d at 1265.

Defendant asserts that one of the reasons for terminating Holliday was her discontent evidenced by her seeking work elsewhere. Specifically, Defendant states that it received phone calls from customers and competitors informing Ramirez that Holliday was looking for other employment. (Alleva Dep. at 68–69; Ramirez Dep. at 216–18; Holliday Dep. at 141–44; McCullough Dep. at 239; Wommack Dep. at 139–40.) Furthermore, Defendant asserts that it terminated Holliday due to her steadfast refusal to perform her duties under Ramirez's direction. (*See* Wommack Dep. at 131, 135; McCullough Dep. at 235–58, 304–05.) Defendant produced evidence that Holliday: (1) took an excessive amount of smoking breaks despite Ramirez counseling her against it on over ten separate occasions; (2) failed to keep up on receiving inventory; (3) inappropriately extended preferred pricing; (4) continued to sell to customers with bad credit in violation of Ramirez's instructions; (5) refused to follow Ramirez's instructions regarding routing of trucks; (6) continued her practice of selling to end users, despite Ramirez's instructions to the contrary; and (7) refused to follow Ramirez's instructions regarding the order in which products should be received. (*Id.* at 97, 107, 109–113, 144, 162, 174, 185, 202, 207, 277–79.) These reasons are not discriminatory and thus satisfy Defendant's "exceedingly light" burden. The burden, therefore, shifts back to Plaintiff to present evidence that Defendant's reasons are pretext for discrimination.

### 3. Plaintiff Cannot Show Defendant's Reasons are Pretextual

In order to show pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* The plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs,* 106 F.3d at 1538 (quotation omitted).

#### i) Defendant's Reasons for the Employment Action are Consistent

A plaintiff may establish pretext by demonstrating that the employer has offered inconsistent reasons for the challenged employment action. *Tidwell v. Carter Products,* 135 F.3d 1422, 1428 (11th Cir.1998). Nevertheless, the fact that the employer offers an additional reason for the employment decision does not suggest pretext if both of the employer's reasons are consistent. *Id.; see also Zaben v. Air Products & Chems., Inc.,* 129 F.3d 1453, 1458–59 (11th Cir.1997) ("Although the company gave differing explanations for the selection of employees to be discharged, saying on the one hand that seniority played no role in the process and that only an employee's performance was considered while, on the other hand, as-

serting that [the employee] was discharged because he had the least seniority, its reasons are not … necessarily inconsistent.").

In this case, Plaintiff claims that Defendant provides shifting reasons for terminating Holliday. Specifically, Plaintiff claims that while Holliday's inadequate performance was not raised at the time she was terminated, her status change form indicates that she was terminated for poor performance.[6] Plaintiff believes that Defendant then added other reasons for her termination by asserting that Holliday was insubordinate, unhappy, and looking for a new job.

Defendant's reasons for Holliday's termination are not inconsistent. It is undisputed that when Holliday was terminated, McCullough stated that she was terminated because she "butted heads" with Ramirez. (Holliday Dep. at 149.) That McCullough failed to detail every instance of Holliday "butting heads" with Ramirez does not indicate that Defendant's story has changed. Accordingly, Ramirez's use of the term laid-off to describe Holliday's discharge merely indicates his belief that she was terminated by Defendant, not an alternate reason for her discharge. Ramirez testified to specific examples of insubordination and inadequate job performance, and these examples are illustrative of the ways in which Holliday balked at Ramirez's authority and failed to carry out her duties under him.

Furthermore, McCullough testified that he indicated to Holliday at her termination that Defendant knew she was unhappy working under Ramirez because she was looking for work elsewhere. (McCullough Dep. at 342.) Thus, although Defendant now expands upon the exact reasons for Holliday's termination, this does not indicate that Defendant changed its story. Instead, Defendant has always stated that Holliday was not a "good fit" due to her unwillingness to perform her job duties as requested by Ramirez. The additional details provided by Defendant support this contention and thus do not evidence shifting reasons for Holliday's termination.

### ii) Defendant's Progressive Discipline Policy Was Not Mandatory

A plaintiff can also show pretext by demonstrating that the employer did not follow its normal procedures in terminating his employment. *See Morrison v. Booth,* 763 F.2d 1366, 1374 (11th Cir.1985) ("Departures from normal procedures may be suggestive of discrimination."). The Eleventh Circuit has indicated that when an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in his case. *Ritchie v. Indus. Steel, Inc.,* 426 Fed.Appx. 867, 873 (11th Cir.2011) (*accord Morris v. City of Chillicothe,* 512 F.3d 1013, 1020 (8th Cir.2008) ("Deviance from a progressive discipline policy can be evidence of pretext")). Nevertheless, if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext. *Id.*

Here, it is undisputed that although Defendant has a progressive disciplinary policy, its policy is not mandatory. Any step of the policy could be skipped at the discretion of Defendant. (Wommack Dep. at

---

6. Plaintiff also perceives Ramirez's statement that Holliday was "laid off" as inconsistent with Defendant's reasons for terminating Holliday. To the extent that Plaintiff is arguing that laid-off has an entirely different meaning than termination, the Court rejects this argument. Ramirez testified that his understanding of the phrase "laid-off" is that an employee is discharged for any number of reasons, including for insubordination, job abandonment, or even that employee's death. (Ramirez Dep. at 238–39.)

134.) Thus, Defendant's failure to utilize the progressive disciplinary policy and issue written warnings to Holliday prior to her termination does not constitute evidence of pretext.

### iii) Plaintiff Has Not Shown that Defendant's Reasons Were Otherwise Pretextual

A plaintiff can demonstrate pretext by showing that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). When an employer asserts that it fired a plaintiff for poor performance, it is not enough for the plaintiff to show that her performance was satisfactory. *Alvarez*, 610 F.3d at 1266. Rather, she must demonstrate that the employer did not believe that her performance was lacking and merely used that claim "as cover for discriminating against [her] on account of [her gender]." *Id.*

Plaintiff argues at length that Defendant's complaints about the quality of Holliday's work were unfounded. However, the fact that Holliday thinks more highly of her performance than her employer is beside the point. The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs. *See Holifield*, 115 F.3d at 1565. The question is not whether Holliday was insubordinate, broke a number of work rules, or sought out employment elsewhere. Instead, the question is whether her employers were dissatisfied with her for these or other nondiscriminatory reasons, even if mistakenly or unfairly so, or used those complaints about Holliday as a cover for gender discrimination.

*See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (inquiry is limited to whether employer believed employee was guilty of misconduct and if so, whether that was the reason behind discharge; that employee did not actually engage in misconduct is irrelevant). Plaintiff must establish not only that Defendant's proffered reasons for her termination were ill-founded, but also that the unlawful discrimination was the true reason for the termination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (showing only that proffered reasons are false does not necessarily get plaintiff past summary judgment).

Here, Plaintiff failed to rebut much of Defendant's evidence that Holliday violated work policies and disregarded Ramirez's instructions. Furthermore, Holliday admits that she spoke negatively about Ramirez to other employees and customers and that she inquired with several customers regarding open positions while she was still employed with Defendant. (Holliday Dep. at 143–44.)

As further evidence that Defendant's proffered reasons are not pretextual, another employee and a prior manager confirm many of Defendant's reasons for termination. *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir.2002) (noting that when employees with good employment histories suddenly begin receiving poor evaluations there may be evidence of pretext, but that where evidence from other sources confirms issues with the plaintiff's work, there is no evidence of pretext). Spivey states that when he was Branch Manager Holliday violated many of the same policies. (Spivey Dep. at 27–28, 94–95.) Robert Alleva, a salesperson at the Grovetown branch, confirms Holliday's inability to work under Ramirez's direction and that Holliday was seeking employment

elsewhere around the time of her termination. (Alleva Dep. at 66–68, 70.) Accordingly, Defendant's belief that Holliday was not adequately performing her job duties and was not content under Ramirez's management was not an unreasonable belief.

Thus, while Plaintiff attempts to rebut Defendant's proffered reasons for terminating Holliday, it failed to prove that she did not violate *any* of the work rules that Defendant claims she violated or that she was not insubordinate to Ramirez. Plaintiff instead would have the Court second-guess Defendant's decision that Holliday failed to perform her job duties in a satisfactory manner. *See Alvarez,* 610 F.3d at 1266; *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). The Court declines to do so in this case where it is clear that Holliday simply failed to perform her duties as Assistant Manager under Ramirez in a manner satisfactory to Defendant.

### iv) Alleged Discriminatory Animus of McCullough

■ Although McCullough's alleged discriminatory statements are not direct evidence of discrimination, "language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out a prima facie case." *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321, 1323 n. 11 (11th cir.1998). Accordingly, the Court considers whether McCullough's alleged discriminatory statements are evidence sufficient to prove that a discriminatory animus more likely motivated Holliday's termination decision than Defendant's proffered reasons.

A plaintiff can demonstrate a discriminatory animus of a decision maker by showing that the decision maker made discriminatory remarks.[7] *See Damon,* 196 F.3d at 1362 (holding that supervisor's statement that he wanted "aggressive, young men" like himself to be promoted was "highly suggestive circumstantial evidence" of discriminatory animus). Such remarks are evidence of pretext because they shed light on the decision maker's state of mind at the time that he made the challenged em-

---

**7.** Plaintiff attempts to impute the alleged discriminatory animus of McCullough to Wommack by the cat's paw theory of liability. The cat's paw theory applies where a plaintiff demonstrates that "the decisionmaker followed the biased recommendation [of a non-decisionmaker] without independently investigating the complaint against the employee." *Stimpson v. Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir.1999). In such an instance, "the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*

Here, Wommack failed to do any independent investigation. His decision was based largely on his discussions with McCullough and to some degree on his conversations with Ramirez. Wommack never discussed any of the complaints with Holliday nor did he interview any other employees beyond McCullough and Ramirez to determine whether the complaints were true. (Wommack Dep. at 174, 177–80, 183, 196, 203, 241.) Wommack did not review Holliday's personnel file or otherwise review any other materials in coming to his decision to terminate. (*Id.* at 132–33.) Therefore, the Court finds that Wommack did not conduct an independent review sufficient to sever any causal connection between the alleged discriminatory animus of McCullough and the decision to terminate Holliday.

Thus, McCullough's alleged discriminatory animus *could* be attributed to Defendant. However, as stated below, the Court finds that there is not a question of fact on whether McCullough's alleged discriminatory animus motivated the termination decision.

ployment decision. *Id.* A discriminatory statement can be probative as to whether a discriminatory animus motivated the decision to terminate a plaintiff. *Id.* at 1363. On the other hand, stray remarks that are "isolated and unrelated to the challenged employment decision" are insufficient to establish pretext. *See Rojas,* 285 F.3d at 1342–43 (supervisor's statement that another employee did not deserve her job because she was a woman was not sufficient to show pretext).

In *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286 (1998), the Eleventh Circuit determined that potentially discriminatory comments not directly related to the employment decision could contribute to a circumstantial showing of a discriminatory animus. *See id.* at 1291. The facts of *Ross,* however, are clearly distinguishable from the present case. In *Ross,* there was fairly strong additional evidence supporting a finding of pretext. Specifically, the supervisor who fired the plaintiff had been engaged in the same activity for which the plaintiff was fired. *Id.*

Similarly, in *Damon,* the Eleventh Circuit determined discriminatory comments by a decision maker were evidence of pretext. In addition to discriminatory comments, there was also evidence of discriminatory firing patterns, that the plaintiff did not violate a cited work rule, and that other employees outside the protected class, engaging in similar acts, were not similarly treated. *Damon,* 196 F.3d at 1361, 1363.

In this case, however, Plaintiff produced no additional evidence of pretext other than these two statements. The Eleventh Circuit has repeatedly indicated that a discriminatory comment, taken alone, is not enough to present a question of material fact on the issue of discriminatory intent. *See Rojas,* 285 F.3d at 1343; *Beaver v. Rayonier, Inc.,* 200 F.3d 723, 731 (11th

Cir.1999); *Damon,* 196 F.3d at 1361–63; *Ross,* 146 F.3d at 1291–92; *see also Teal v. City of Dahlonega,* No. 2:09–CV–0187, 2012 WL 95555, at *3 (N.D.Ga. Jan. 12, 2012) (finding sufficient evidence of pretext when decision maker allegedly made two discriminatory remarks where there was also other evidence that Defendant's employment decision was motivated by discriminatory animus). Accordingly, the Court finds that these two alleged discriminatory statements taken alone are insufficient to create an issue of material fact regarding whether Defendant's proffered reasons for Holliday's termination were motivated by McCullough's alleged discriminatory animus.

### C. No Mixed Motive Claim

Plaintiff attempts to raise a "mixed motive" theory for the first time in its response brief to Defendant's motion for summary judgment. Importantly, Plaintiff did not raise the "mixed motive" issue in its complaint, and the section in its response brief is sufficient neither to provide Defendant with adequate notice of the new claim nor to amend the original complaint. *See Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314–15 (11th Cir. 2004) (holding insufficient Gilmour's attempt to raise a new claim in response to the employer's summary judgment motion and noting that the proper procedure to assert a new claim would have been to seek to amend the complaint); *Keaton v. Cobb Cty.,* —— Fed.Appx. ——, ——, No. 08–11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009). Accordingly, the Court will not address a "mixed motive" theory.

### IV. MOTION TO STRIKE

### A. Elease Taylor's Affidavit

Defendant filed a motion to strike the entire affidavit of Elease A. Taylor ("Tay-

lor") and certain paragraphs of Holliday's affidavit. (Doc. no. 41.) Defendant requests that the Court strike Taylor's affidavit (doc. no. 37, Ex. 1) due to the timing of Plaintiff's disclosure of Taylor as a witness. Additionally, Defendant asserts that much of Taylor's affidavit consists of conclusory allegations. The Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir.2000) (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985)). As Taylor's affidavit fails to provide material facts relevant to Plaintiff's claims, and many of its statements are conclusory and thus were not relied upon in deciding the motion for summary judgment, Defendant's motion to strike Taylor's affidavit is **DENIED AS MOOT.**

**B. Holliday's Affidavit**

Defendant argues that some of Holliday's statements in her affidavit (doc. no. 37, Ex. 2) are conclusory as well. Defendant argues that paragraphs 3, 5, 6, 8, 10, 11, and 17 are all conclusory statements that the Court should strike. To the extent that the disputed statements are conclusory, the Court has not considered them as evidence at the summary judgment stage and declines to strike those statements.

■ Defendant also argues that the Court should strike one of the statements in Holliday's affidavit due to its contradiction with Holliday's prior sworn testimony. Recognizing that parties may try to escape summary judgment by using affidavits to create issues of fact where none exist, the Eleventh Circuit has allowed an affidavit to be disregarded as a "sham" if it flatly contradicts earlier deposition testimony in a manner that cannot be explained. *Van T. Junkins and Assoc. v.*

*U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984). Under the sham affidavit concept, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* The sham affidavit concept applies to limited circumstances, and thus, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986) (internal quotation marks omitted). The Court must be careful to distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953. "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." *Id.* at 954.

Defendant requests that the Court strike paragraph 31 of Holliday's affidavit stating that she "was not unhappy working with Ramirez." (Holliday Aff. ¶ 31.) While much of her deposition testimony indicates that she was unhappy, the deposition testimony does not "flatly contradict" her affidavit. Moreover, to the extent that this statement may be at odds with statements made by Holliday in her deposition, the inconsistencies do not rise to the level of a sham affidavit but would go more to Holliday's credibility. Thus, the Court declines to strike paragraph 31 of Holliday's affidavit under the sham affidavit rule. Accordingly, Defendant's Motion to Strike (doc. no. 41) is **DENIED.**

**V. CONCLUSION**

Based upon the foregoing, Defendant's Motion for Summary Judgment (doc. no.

23) is **GRANTED** and Defendant's Motion to Strike (doc. no. 41) is **DENIED.** The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk **SHALL** terminate all deadlines and motions, and **CLOSE** the case.